EXXON CHEMICAL PATENTS, INC., Exxon Corporation and Exxon Research and Engineering Co., Plaintiffs–Appellees,

v.

LUBRIZOL CORPORATION, Defendant–Appellant.

Nos. 93–1275, 94–1309.

United States Court of Appeals, Federal Circuit.

Sept. 1, 1995.

William C. Slusser, Baker & Botts, L.L.P., Houston, Texas, and Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., argued for plaintiffs-appellees. With them on the brief were Lawrence F. Scinto, Hugh C. Barrett, Fitzpatrick, Cella, Harper & Scinto, New York, New York, Thomas Gibbs Gee, Lee L. Kaplan, and David Hricik, Baker & Botts, L.L.P., Houston, Texas, and George E. Glober, Jr., Exxon Chemical Co., Houston, Texas and Allen M. Sokal, Finnegan, Henderson, Farabow & Garrett, Washington, D.C.

S. Leslie Misrock, Pennie & Edmonds, New York, New York, and Timothy B. Dyk, Jones, Day, Reavis & Pogue, Washington, D.C., argued for defendant-appellant. With them on the brief were George J. Moscarino, John W. Edwards, II, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Stanton T. Lawrence, III, Paul J. Zegger, Pennie & Edmonds, New York, New York, and Kenneth R. Adamo, Jones, Day, Reavis & Pogue, Dallas, Texas.

Before NIES, PLAGER, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Lubrizol Corporation (Lubrizol) appeals the February 5, 1993 judgment of the United States District Court for the Southern District of Texas, Houston Division, *inter alia* holding that U.S. Patent No. 4,867,890 assigned to Exxon Chemical Patents, Inc. (Exxon) is not invalid under 35 U.S.C. § 102 or § 103 (1988) and is enforceable, and that Lubrizol willfully infringed the claims of the '890 patent. We reverse the judgment of infringement.[1] We vacate the award of attorneys' fees and costs to Exxon, the injunction entered against Lubrizol, and the damage award entered on February 15, 1994.

### I

After extensive discovery, this patent infringement case was tried to a jury. Following the jury's verdict of willful infringement, the judge concluded that the case was exceptional under 35 U.S.C. § 285 (1988) and awarded Exxon its attorneys' fees and costs. Lubrizol's post trial motion for judgment as a matter of law or for a new trial was denied by the judge, and Lubrizol timely brought this appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(1) (1988).

The central issue in this appeal is claim interpretation. Exxon's claims are to a lubricating oil composition suitable for use as a crankcase lubricant in internal combustion engines. The claimed composition is defined as comprising—meaning containing at least—five specific ingredients. Exxon contends that its patent claims a "recipe" of ingredients that extends to any product made by using the claimed ingredients, even if the product itself—as a result of chemical complexing—fails to include one of the claimed ingredients. Lubrizol argues that since Exxon claims a composition *product*—not a process for making a product or a product made by a claimed process—the '890 patent only extends to final products that include the specified claimed ingredients.

The trial judge, candidly expressing considerable difficulty in understanding the chemistry and law involved in the case, treated the issue of claim interpretation as a matter of deciding which of the two parties offered the correct meaning of the claims. The jury was charged according to Exxon's preferred claim interpretation.

■ The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970 (Fed.Cir.1995). In the exercise of that duty, the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties. The pursuit of that obligation in this case would have resulted in a determination that Exxon's preferred claim interpretation is incorrect, and that Lubrizol's is only partly correct. As we explain below, under a jury charge stating the correct interpretation of the claims, no jury could reasonably have found—on the evidence submitted by Exxon—that Lubrizol's accused products literally infringe Exxon's claims. Because of Exxon's failure of proof, Lubrizol is entitled to judgment as a matter of law. *See Zenith Labs., Inc. v. Bristol–Myers Squibb Co.*, 19 F.3d 1418, 1424, 30 USPQ2d 1285, 1290 (Fed.Cir.1994). Accordingly, we reverse the final judgment on liability entered on the jury verdict and vacate the order awarding attorneys' fees and costs and the injunction entered against Lubrizol. The judgment of the District Court which is the subject of Lubrizol's companion appeal challenging the award of damages is vacated.[2]

---

1. The judgment is limited to literal infringement of Exxon's claims. The jury was charged solely with respect to literal infringement, directly or by inducement or contribution, and whether such literal infringement was willful. Although Exxon initially proposed a jury charge on infringement under the doctrine of equivalents, its counsel consented to the deletion of the doctrine of equivalents from the infringement charge given to the jury. Lubrizol's brief notes that "Exxon asserted only literal infringement", and Exxon does not contest that statement. The dissenting opinion raises a question of whether Exxon is now entitled to a jury trial on infringement under the doctrine of equivalents. That issue was not briefed or argued to the panel, and consequently we, unlike Judge Nies, express no view on that question.

2. The issue of damages was reserved for trial after the trial on liability. The damage award against Lubrizol entered on February 15, 1994, is appealed in No. 94–1309, oral argument in which was heard on March 8, 1995. We have

## II

Exxon and Lubrizol manufacture crankcase lubricating oil compositions and concentrate compositions which are mixed with oil basestock to produce lubricating oils for motor vehicle engines. Such products typically contain the following components as additives: (1) a dispersant, which suspends impurities to prevent sludge and varnish deposits on engine parts, (2) ZDDP, a zinc-containing compound that inhibits engine wear and produces antioxidant results for the oil, (3) a detergent, which helps prevent engine deposits, and (4) a supplemental antioxidant, necessary because use of ZDDP is limited by environmental concerns. Oxidation of the oil component substantially shortens the life of lubricating oils. Oxidation results in increased acidity of the lubricant, which can enhance corrosion of engine parts and increase viscosity of the product, thereby degrading its lubricant qualities.

Exxon's '890 patent seeks enhanced antioxidant results by the addition of a small amount of copper as the supplemental antioxidant to the other typical ingredients of the product. The prosecution history of Exxon's patent emphasized the beneficial synergistic effects caused by the added copper when in the presence of an ashless dispersant.

## III

 We have recently concluded in banc that claim interpretation is a matter of law, and that the trial judge alone has the duty and responsibility to interpret the claims at issue. *Markman*, 52 F.3d at 970. After close of the evidence in this case, the judge heard argument from the parties on the meaning of Exxon's claims. During that argument, Lubrizol argued that the meaning of the claims should be left to the jury for decision, if the court failed to agree with

Lubrizol's preferred claim interpretation. The judge correctly refused to submit the issue to the jury, and instead decided which of the two proffered interpretations seemed most correct. It may well be that in some cases one side or the other will offer the correct claim interpretation to the judge. More often, however, it is likely that the adversaries will offer claim interpretations arguably consistent with the claims, the specification and the prosecution history that produce victory for their side. In any event, the judge's task is not to decide which of the adversaries is correct. Instead the judge must independently assess the claims, the specification, and if necessary the prosecution history, and relevant extrinsic evidence, and declare the meaning of the claims. No matter when or how a judge performs the *Markman* task, on appeal we review the issue of claim interpretation independently without deference to the trial judge.

## IV

 Representative of the claims of the '890 patent, claim 1 is directed to "[a] lubricating oil composition suitable as a crankcase lubricant in internal combustion engines comprising" (1) a major amount of lubricating oil, (2) an ashless dispersant (*i.e.* one that neither contains nor is complexed with metal) in specified amounts of "about 1 to 10 wt. %", (3) from about 0.01 to 5.0 parts by weight of oil soluble ZDDP, (4) 5 to 500 parts per million by weight of added copper in the form of an oil soluable copper compound, and (5) magnesium or calcium detergent.[3]

The subject of claim interpretation was argued to the judge at the close of Exxon's case and was considered again in extensive argument at the close of all the evidence. At the conclusion of the arguments, the judge

---

consolidated the appeal in No. 94–1309 with the appeal in No. 93–1275. In light of our reversal of the liability judgment against Lubrizol, no basis remains for a damage judgment against Lubrizol, and we therefore vacate the damage judgment entered in this case.

**3.** The full text of claim 1 is set forth in the appendix to this opinion. Claim 61 of the '890 patent is drawn to a lubricating oil concentrate

composition suitable for use in preparing crankcase lubricants. That claim, like claim 1, has specific quantity limitations for the ingredients, including the ashless dispersant ingredient. However, claim 61 does not require a "major amount" of lubricating oil (it requires "a lubricating oil," without specific amount), and it requires 10 to 60 wt. of ashless dispersant. Both claims were submitted to the jury.

decided that Exxon was correct in its view of the claims' meaning. The parties did not contend that the claims of the '890 patent are process claims drawn to a specified manner of manufacture, and the claims as written could not have such meaning. Nor are the claims said to be, or could they be, product-by-process claims. The claims of the '890 patent are drawn to a particular composition: they are product claims. According to Exxon, its claims cover any product that is made by using the specific ingredients identified in the limitations of claim 1.[4] During the trial, Exxon's claims were thus said to be to a "recipe" for making the composition. Whether the specified ingredients could be found in the actual composition produced by mixing the ingredients is, according to Exxon, simply irrelevant to the meaning of the claims. To emphasize this point, Exxon's counsel stated—both to the trial judge and this court—that Exxon's claims will cover a composition that has the added copper regardless of whether any ashless dispersant can be found in the mixture. In short, in Exxon's view the claimed "recipe" for making the claimed product *is* the claimed product.

The trial judge charged the jury accordingly:

> I instruct you that Exxon's claims cover the ingredients which go into the composition. If you find that Exxon has proved that a Lubrizol product is made by using the starting ingredients in the amounts called for in one or more of Exxon's claims, then that product directly infringes.

The issue of claim interpretation had been raised first by Lubrizol in its motion for a directed verdict at the close of Exxon's case, which the judge denied. The issue was raised again by Lubrizol's motion for judgment as a matter of law at the close of all the evidence, also denied by the judge. The charge to the jury on claim interpretation was also challenged by Lubrizol, both before the case was submitted to the jury and by the post trial motion for judgment as a matter of law.

As noted above, Exxon's claims are drawn to a specific product which has particularly defined ingredients. Nothing in the claims, the specification, or the prosecution history suggests that Exxon's claims are not drawn to a product that contains particular ingredients. Indeed, to the contrary, the title to the '890 patent reads, with the emphasis added, "Lubricating Oil Compositions *Containing* Ashless Dispersant, [ZDDP], Metal Detergent and a Copper Compound". *See Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 780, 227 USPQ 773, 777–78 (Fed.Cir.1985) (referring to patent's title as interpretative aid). The language of claim 1 refers to "added" copper and to a detergent "additive." The specification demonstrates that those claim references aim at a chemical composition to which ingredients are being introduced. We must give meaning to all the words in Exxon's claims. *In re Sabatino*, 480 F.2d 911, 913, 178 USPQ 357, 358 (CCPA 1973) ("Claim limitations defining the subject matter of the invention are never disregarded.") In addition, the text of the '890 specification includes over twenty references to "containing" in reference to the ingredients claimed in the composition. Furthermore, during prosecution of the applications that resulted in the '890 patent, Exxon repeatedly emphasized that the genius of its invention lay "in the *previously unknown* synergism of this material [copper] with ZDDP in the presence of an ashless dispersant of the type described in the application...."

In sum, a review of the claims, the specification, and the prosecution history all point to the conclusion that Exxon claims a product, not merely a recipe for making whatever product results from the use of the recipe ingredients. This conclusion respects that

---

4. If the claim is defined solely by the starting ingredients, a product actually containing all the specified ingredients would seem to escape at least literal infringement if produced by the combination of different ingredients. Such is at odds with the doctrine that a product claim is infringed by any product containing every claim limitation, regardless of how the product is made. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533,

1535, 19 USPQ2d 1367, 1369 (Fed.Cir.1991); *see also* 2 Donald S. Chisum, *Patents* § 8.05 at 8–79 (1994) (collecting cases). Under Exxon's view, its claims also would seem not to reach a product made with a nonashless dispersant starting ingredient that is somehow rendered ashless during manufacture, if such a rendering is chemically possible.

which is claimed, namely a chemical composition. The chemical composition exists at the moment the ingredients are mixed together. Before creation of the mixture, the ingredients exist independently. The particular proportions specified in the claims simply define the characteristics of the claimed composition.

Under Lubrizol's view of the claims, as asserted at trial and on appeal, the composition claimed by Exxon is limited to the final product made and ready for use in the engine environment. Lubrizol is correct that the claims read on a product, not simply a recipe, but Lubrizol errs in thinking that the claims read only on end product compositions. Lubrizol thus asserts a claim meaning that depends upon the time at which one views the composition claimed. The specification as a whole, and the claims in particular, contain no temporal limitation to the term "composition." Indeed, claim 61 reads on a concentrate for preparing lubricants, which is hardly a product ready for consumer end use. The composition of claim 1, once its ingredients are mixed, is a composition existing during manufacture that is being used to produce the end product. Consequently, as properly interpreted, Exxon's claims are to a composition that contains the specified ingredients at any time from the moment at which the ingredients are mixed together. This interpretation of Exxon's claims preserves their identity as product claims, and recognizes as a matter of chemistry that the composition exists from the moment created. Although Lubrizol is correct in taking Exxon's claims to read on a product, its interpretation of Exxon's claims is too narrow. Exxon is entitled to a broader scope that is not time-limited, one that reads on any product at any time that contains the claimed proportions of ingredients. The correct interpretation simply affords Exxon a wider range of product on which to assert infringement. Indeed, Exxon even took advantage of the correct interpretation during trial. When defending its case under Lubrizol's claim interpretation, Exxon did not introduce evidence that Lubrizol's final product infringed. Instead of offering evidence that analyzed the components of Lubrizol's final product, Exxon's witnesses testified to the reaction that

occurs when the Lubrizol product is in the process of being made into the final product. According to Exxon's witnesses, that reaction did not result in complete elimination of ashless dispersant in the product. Exxon thus did not focus on Lubrizol's final product to prove infringement. Exxon adopted the broader view and described the infringing activity as occurring while the claimed ingredients were undergoing chemical reactions, necessarily a time before the final product, ready for sale, exists.

We thus hold that the judge erred as a matter of law in giving Exxon's preferred claim interpretation to the jury, and in using that interpretation in ruling on Lubrizol's post trial motion. Under the proper charge, the jury would not have been asked if Lubrizol used Exxon's starting ingredients. Instead, the jury would have been asked to find whether Exxon had proved by a preponderance of the evidence that Lubrizol's products at some time contained each of the claimed recipe ingredients in the amounts specifically claimed.

V

 Given the correct interpretation of Exxon's claims, the dispositive question before us is whether any jury could reasonably have found that Lubrizol's accused products literally infringe the claims of the '890 patent as properly construed. *Jamesbury Corp. v. Litton Indus. Prods.*, 756 F.2d 1556, 1560–61, 225 USPQ 253, 257 (Fed.Cir.1985). Our authority to decide this question has been explicitly stated by the Supreme Court:

> If the evidence presented in the first trial would not suffice, as a matter of law, to support a jury verdict under the properly formulated defense, judgment could properly be entered for the respondent at once, without a new trial. And that is so even though (as petitioner claims) respondent failed to object to jury instructions that expressed the defense differently, and in a fashion that would support a verdict.

*Boyle v. United Technologies Corp.*, 487 U.S. 500, 513–514, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988). Lubrizol thus may be entitled to judgment as a matter of law. *Id.*

"The question of whether the evidence is sufficient to create an issue of fact for the jury is itself a question of law, which we will now decide." *Jamesbury*, 756 F.2d at 1560, 225 USPQ at 257. Literal infringement requires that every limitation in Exxon's claims be found in the accused product. *Laitram*, 939 F.2d at 1535, 19 USPQ2d at 1369. Exxon's burden is thus to prove by a preponderance of the evidence, among other things, that Lubrizol's products contained at some time ashless dispersant in the amounts specifically claimed.

From the beginning of the trial, Exxon was on notice that Lubrizol's view of claim interpretation required Exxon to prove that Lubrizol's products contained ashless dispersant in the amounts specified. Exxon was also aware from discovery that Lubrizol would defend against the charge of infringement by proof that its products as manufactured contained no ashless dispersant. Exxon thus had the choice of simply proving infringement under *its* view of the claims, or in addition proving infringement under Lubrizol's view as well. Exxon chose to do both. Lubrizol's defense on its view of the claims is based on its evidence that, when one mixes the ingredients specified in Exxon's claims, (1) the soluble copper compound reacts with ZDDP to form a zinc compound and CuDDP and (2) zinc then bonds to the formerly ashless dispersant to render it non-ashless, inasmuch as, after the reaction, it is complexed with a metal. According to Lubrizol, the reactions are immediate and the bond formed between the dispersant and zinc is firm, and as a result, its product lacks the ashless dispersant specified as a necessary ingredient in Exxon's claims.

At trial, Exxon sought to prove its case, under Lubrizol's claim interpretation, with testimony that the bond formed between the zinc and the dispersant was a weak one. The bond was described as unstable, with the

molecules bonding, unbonding and rebonding constantly. The process was described variously as analogous to a square dance with partners swapping around, to hand-holding and unholding, and to hats being taken on and off. The bonding and unbonding, also described as a "dynamic equilibrium," occurs an infinite number of times. According to Exxon, the weak bond—with its constant reversal and rebonding—proved that Lubrizol's dispersant was not always nonashless, and therefore sometimes ashless. Exxon's proof was supplied by expert opinion and did not include any scientific measurements resulting from tests of Lubrizol's accused products. Exxon's proof did not relate to infringement by Lubrizol's *final* products. Instead, its proof was aimed at the presence of ashless dispersant during manufacture of the end product.

Lubrizol's expert witnesses countered with their opinion that the bond created between the zinc and the dispersant was a strong complex, and that the dispersant remained non-ashless 99.999% of the time. The testimony of Lubrizol's witnesses relied on nuclear magnetic resonance tests performed by Lubrizol on its products, and concluded that there is no ashless dispersant in Lubrizol's accused products after blending their starting ingredients.

We may assume for purposes of this appeal that a jury hearing such evidence could reasonably have concluded that—at some time—during the manufacture of the product or in its manufactured state—ashless dispersant is found in Lubrizol's product.[5] That assumption, however, is not dispositive of Lubrizol's post trial motion for judgment as a matter of law. It is not enough for Exxon to prove that *some* of the dispersant in Lubrizol's product is ashless even if momentarily. Lubrizol's motion is only thwarted if Exxon has supplied testimony from which a reason-

---

5. On the record before this court, it is not clear that the trial judge meant for the jury to consider the testimony about the nature of the bond between the zinc and the ashless dispersant. In discussions with counsel, the judge stated clearly that he would charge the jury as Exxon wanted, and under Exxon's view of the claims what "happens in the pot" during or after manufacture of the composition, and Lubrizol's nuclear magnet-

ic resonance evidence, is simply irrelevant. Under the claim interpretation charge given, there was no reason for the jury to consider the evidence of both parties going to whether Lubrizol infringes under its view of the claims. To find infringement as charged, all the jury had to find is that Lubrizol used Exxon's claimed starting ingredients in the amount claimed, an essentially uncontested fact.

able jury could conclude that Lubrizol's products contain ashless dispersant in the specific amounts claimed. Exxon offered no testimony on the amounts of ashless dispersant present *in* Lubrizol's products. Nor did Exxon provide the jury with direct evidence from which it could have inferred that the required percentages are found in the composition after it is created out of its specified starting ingredients. In its briefs to this court, Lubrizol emphasized Exxon's failure of proof with regard to the quantities of the ingredients contained in the accused products. Exxon did not respond with assertions that the record included proofs of the *quantities* of ingredients present in the accused products. Instead, Exxon argued only that "Lubrizol started with the requisite amount of ashless dispersant and, even under its theory, ashless dispersant is still present in Lubrizol's final product, albeit in ever-changing form." In order to prevail under properly interpreted claims, Exxon was obliged to prove both the presence of ashless dispersant and presence of the required quantity. Exxon's failure as to the latter requires us to conclude as a matter of law in Lubrizol's favor.

■ Post-trial motion practice entails, *inter alia,* ascertainment of whether correct law has been applied to the facts presented at trial in reaching a verdict or judgment. When a trial judge determines on a post-verdict motion what the law correctly is, the judge then determines whether any juror could reasonably have reached—on the evidence presented at trial—the verdict challenged by the post-verdict motion. If the answer is no, the trial judge reverses the jury verdict for failure of proof on the correct legal standard, and denies the loser a second trial on the correct law. That is what happened at trial in *Markman,* and we affirmed that disposition *in banc,* 52 F.3d 967, 973, 989.

■ When we determine on appeal, as a matter of law, that a trial judge has misinterpreted a patent claim, we independently construe the claim to determine its correct meaning, and then determine if the facts presented at trial can support the appealed judgment. If not, we reverse the judgment

below without remand for a second trial on the correct law. That is what we did to the bench trial in *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1539 (Fed.Cir.1991), citing as support the very language from the Supreme Court decision in *Boyle* that we rely upon herein to deny Exxon the second trial that Judge Nies would provide. We ordinarily do the same thing in the appellate review of jury trial cases, typically explaining our duty as follows:

> Accordingly, we must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in Litton's favor when the correct legal standard is applied. If there is not, Jamesbury was entitled to have the question removed from the jury and decided as a matter of law.

*Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 756 F.2d 1556, 1560 (Fed.Cir.1985). *See also Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 419 (Fed.Cir.1988). Such judicial events are not extraordinary.

■ On the facts of this case, we perceive no reason to deviate from, or reject, the settled law that compels reversal. The correct meaning of Exxon's claims is but a slight variance from that urged vigorously and continuously by Lubrizol. That Lubrizol sought to hold Exxon to proof of infringement of *product* claims hardly comes, or came, out of the blue. Exxon was fully aware that Lubrizol stood on a claim meaning that would require Exxon to prove the presence of specified amounts of claimed ingredients in *some* Lubrizol product. In fact, Exxon attempted to prove infringement under the interpretation we give to its claims. We have noted that Exxon chose not to introduce proofs of the contents of Lubrizol's *final* products. Rather, its proof of the presence of some ashless dispersant, evidence that we credit in testing the denial of the post verdict motion, relates to product in pre-final states. Nothing precluded Exxon from arguing and seeking to prove that *a* Lubrizol product, at some time after its creation, contained the specified ingredients in the claimed amounts. We have emphasized that Exxon's error was in failure of proof as to the claimed amounts, without which it could not prove infringe-

ment under Lubrizol's claim meaning. The trial judge did not interpret the claims until all the evidence was in, just before the case was submitted to the jury. Exxon—knowing Lubrizol's defense—knew that it would lose on Lubrizol's claim meaning unless it could show the presence of the claimed ingredients in the claimed amounts in some Lubrizol product. Exxon was free to choose the moment at which it would identify with proof that a Lubrizol product infringed. Thus, Exxon could have argued and sought to prove that ashless dispersant is present in the claimed percentages, along with the other claimed ingredients in their specified amounts, at any time from the moment of creation of Lubrizol's product. Exxon cannot now claim surprise from our variation on

Lubrizol's claim meaning and cry foul in not having a second chance to prove what it was free to prove at trial. Consequently, on the facts of this case, we discern no reason to carve an exception into the settled law in order to provide Exxon an opportunity to escape from the flaws in its claim drafting (as described in Judge Plager's concurring opinion) and trial strategy. We therefore disagree with Judge Nies's view that our reversal without remand for a second trial is improper.[6]

## VI

Because Lubrizol is entitled to a judgment of noninfringement as a matter of law and thus to vacation of the order awarding Exxon its attorneys' fees and costs and of the in-

**6.** *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed.Cir.1986), and *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320 (Fed. Cir.1991), do not stand in the way of our decision. Each case raised the question whether a party seeking to upset a jury verdict on a post verdict motion had failed to preserve the ground for the post verdict motion by failing to specify that ground in earlier directed verdict motions. In *Orthokinetics*, the specific question was whether a motion for directed verdict of simple non-infringement embraced a later post verdict motion seeking to upset a jury verdict of willful infringement. The trial court had granted the motion, holding the evidence insufficient to support a jury verdict of willful infringement. This court concluded that the movant had failed to preserve the issue of willful infringement for the post verdict motion. 806 F.2d at 1579. This court, however, did not reverse the grant of the post verdict motion for failure to have preserved its ground. Indeed, this court did not conclude that the district court was even required to reject the post verdict motion. We only noted that the "district court might well have refused consideration of willfulness on the motion for JNOV in light of Rule 50(b)." *Id.* at 1580. Dispositively, this court held the ruling on the post verdict motion ripe for appellate review because the non-movant had not objected to the grounds stated in the post verdict motion.

It is difficult to understand how *Orthokinetics* in Judge Nies's hands helps the cause she advocates for Exxon. This is so because *Orthokinetics* teaches that even a legally insufficient post verdict motion may be acted upon by the trial judge with that action preserved for appellate review, if the non-movant has not objected to the content of the post verdict motion. We note, in passing, that Exxon did not object to the content of Lubrizol's post verdict motion.

*Malta* sheds interesting light on what can be devined from *Orthokinetics*. In *Malta*, the ques-

tion was whether a barebones motion for directed verdict, at the close of all the evidence, of noninfringement "on the grounds that the evidence is insufficient," 952 F.2d at 1324, was sufficient to support a post verdict motion challenging the verdict of infringement under the doctrine of equivalents for lack of "particularized function/way/result testimony and linking argument." *Id.* at 1325. This court concluded that the earlier general motion of noninfringement embraced all the particular arguments in support of the post verdict motion. In the light of *Malta*, we cannot fault the failure of Lubrizol, in its post verdict motion, to have argued that Exxon could prove infringement under Lubrizol's theory by proving not only that Lubrizol's *final* product infringed, but that *any* product made by Lubrizol that existed after the moment of creation also could infringe. Indeed, the spread between the general and the specific in *Malta* is enormous, compared to the distance between the meaning we give Exxon's claims on appeal and that advanced by Lubrizol to the trial judge. Lubrizol's view of the claims is less generous to Exxon than ours. If only Lubrizol's *final* product could infringe Exxon's claims, Exxon's proofs fail completely since it produced no evidence of the content of any Lubrizol *final* product. Only under the interpretation we give Exxon's claims does Exxon's evidence of infringement of a product claim have any relevance. This is so because the only evidence Exxon put on to show the presence of ashless dispersant in a Lubrizol product was evidence of the reaction that occurs during the manufacture of the Lubrizol final product. This evidence was offered when Exxon did not know if the trial court would accept its, or Lubrizol's proffered claim interpretation. Exxon thus focussed on a product of Lubrizol that was not its final product, but, as we have noted, Exxon fell short of demonstrating that the ashless dispersant, when present, was present in the claimed amounts.

junction entered against Lubrizol, we need not reach the other grounds asserted by Lubrizol for reversal of the judgment of infringement or in the alternative for a new trial. Because there is no basis for a damage award against Lubrizol, we vacate the damage award in appeal No. 94–1309.

No costs.

*REVERSED.*

## APPENDIX

Claim 1 of the '890 patent reads as follows:

1. A lubricating oil composition suitable as a crankcase lubricant in internal combustion engines comprising:

A. a major amount of lubricating oil;

B. a dispersing amount of lubricating oil dispersant selected from the group consisting of:

(1) ashless nitrogen or ester containing dispersant compounds selected from the group consisting of:

(a) oil soluble salts, amides, imides, oxazolines, esters, and mixtures thereof, of long chain hydrocarbon substituted mono- and discarboxylic acids or their anhydrides;

(b) long chain aliphatic hydrocarbons having a polyamine attached directly thereto; and

(c) Mannich condensation products formed by condensing about a molar proportion of long chain hydrocarbon substituted phenol with from about 1 to 2.5 moles of formaldehyde and from about 0.5 to 2 moles of polyalkylene polyamine; wherein said long chain hydrocarbon group is a polymer of a $C_2$ to $C_5$ monoolefin, said polymer having a molecular weight of from about 700 to about 5000;

(2) nitrogen or ester containing polymeric viscosity index improver dispersants which are selected from the group consisting of:

(a) polymers comprised of $C_4$ to $C_{24}$ unsaturated esters of vinyl alcohol or of $C_3$ to $C_{10}$ unsaturated mono- or dicarboxylic acid with unsaturated nitrogen containing monomers having 4 to 20 carbons,

(b) copolymers of $C_2$ to $C_{20}$ olefin with $C_3$ to $C_{10}$ mono- or dicarboxylic acid neutralized with amine, hydroxy amine or alcohols, and

(c) polymers of ethylene with a $C_3$ to $C_{20}$ olefin further reacted either by grafting $C_4$ to $C_{20}$ unsaturated nitrogen containing monomers thereon or by grafting an unsaturated acid onto the polymer backbone and then reacting said carboxylic acid groups with amine, hydroxy amine or alcohol; and

(3) mixtures of (1) and (2); wherein when said lubricating oil dispersant (1) is present, then said dispersing amount of (1) is about 1 to 10 wt. %, and when said lubricating oil dispersant (2) is present, then said dispersing amount of (2) is from about 0.3 to 10 wt. %;

C. from about 0.01 to 5.0 parts by weight of oil soluble zinc dihydrocarbyl dithiophosphate wherein the hydrocarbyl groups contain from 1 to 18 carbon atoms;

D. an antioxidant effective amount, within the range of from about 5 to about 500 parts per million by weight, of added copper in the form of an oil soluble copper compound; and

E. a lubricating oil detergent additive which comprises at least one magnesium or calcium salt of a material selected from the group consisting of sulfonic acids, alkyl phenols, sulfurized alkyl phenols, alkyl salicylates and naphthenates, wherein said parts by weight are based upon 100 parts by weight of said lubricating composition and said weight % is based on the weight of said lubricating composition.

PLAGER, Circuit Judge, concurring.

I join in the reversal of the trial court's judgment of infringement, based on what I consider to be the correct claim interpretation as advanced by Judge Clevenger, and the consequences that flow therefrom.

There is testimony in the record that indicates that it is not known exactly how the chemical complexing, described in the opin-

ion, actually works. If this is so, then Exxon's burden, to prove that the chemical ingredients exist at some point in the accused composition in the claimed proportions, may be impossible of accomplishment. That could be said to argue in favor of an alternative construction of the claims, that what was meant was a process or product-by-process claim.

The difficulty with that argument is that the claims, as the opinion well demonstrates, are unquestionably composition of matter claims. In retrospect, it would appear that Exxon wishes it had product-by-process claims, and thus a "recipe." But we are not free to read the claims as they might have been drafted, even if as drafted they do not accomplish what the inventor may have intended.

Claim drafting is itself an art, an art on which the entire patent system today depends. The language through which claims are expressed is not a nose of wax to be pushed and shoved into a form that pleases and that produces a particular result a court may desire. The public generally, and in particular, the patentee's competitors, are entitled to clear and specific notice of what the inventor claims as his invention. That is not an easy assignment for those who draft claims, but the law requires it, and our duty demands that we enforce the requirement. There is no room in patent claim interpretation for the equivalent of the *cy pres* doctrine; that would leave the claiming process too indefinite to serve the purposes which lie at the heart of the patent system.

NIES, Circuit Judge, dissenting.

Contrary to conventional wisdom in the art, Exxon discovered that small amounts of copper in automobile motor oil acts as an antioxidant, and it developed a highly successful commercial product using that discovery. The record discloses that Lubrizol learned of the presence of copper in Exxon's motor oil from Exxon's U.K. patent application and used the disclosure to prepare a competitive product. Both companies now use copper in the vast majority of their passenger car motor oil formulations. Following this phase of the litigation finding Lubrizol liable for infringement of Exxon's U.S. Patent No. 4,867,890, Exxon was awarded $48,000,000 in damages which were doubled for willfulness and $8,700,000 in interest plus $23,700,000 in attorney fees.[1]

The issue of infringement essentially comes down to whether Exxon drafted a claim in its U.S. patent that covers its invention. The majority interprets the claims to require that each of the listed additives to a motor oil must retain its pre-mix identity, to the extent that each must be present in the claimed proportions at some point after mixing. Because Exxon failed to prove that the additives remained identifiable (in those proportions) in Lubrizol's product at some time during or after mixing, the majority reverses the judgment of infringement. I agree with the trial court that Lubrizol infringes. Lubrizol's motor oil contains the required additives in the required amounts. To hold that the final product does not "comprise" those ingredients because of their possible reaction with each other upon mixing seems to me nothing short of double speak. The claims can be interpreted as the majority does only by reading them in isolation from the context of the patent. Moreover, the majority's interpretation gratuitously provides grounds for invalidation of the patent under section 112, because the specification does not describe nor enable one skilled in the art to make a product containing the claimed ingredients in the claimed amounts except as starting ingredients, not mixed ingredients.[2]

The majority focuses principally on the claimed "ashless dispersant" which must remain in its view "ashless" in the required amount in the composition. I interpret "ashless dispersant" as simply the name or designation of an ingredient required as one of the

---

1. Appeal No. 94–1309 challenging the amount of damages is mooted by the majority decision.

2. Paragraph 1 of 35 U.S.C. § 112 (1988) states, in relevant part: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same...."

additives. It does not mean the ingredient must remain inert.

As stated in *Adams v. United States*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966), "it is fundamental that claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the invention." Moreover, claims should be "construed, if possible, as to sustain their validity." *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1577, 28 USPQ2d 1333, 1337 (Fed.Cir.1993).

Applying those precepts warrants an affirmance in this case. My concern is, however, not merely this case. The majority mandates technical rules for how chemical compositions must be claimed which I reject.

## I.

Infringement here turns on interpreting claims 1 and 61. Claim 1 is directed to "a lubricating oil composition" comprising: (a) a major amount of lubricating oil; (b) a specified amount of dispersant (either about 1–10 wt. percent of an ashless dispersant [3] or about 0.3–10 wt. percent of a "polymeric viscosity index improver" [4]); (c) about 0.01 to 5.0 parts by weight of zinc dihydrocarbyl dithiophosphate ("ZDDP"); (d) about 5 to about 500 parts per million by weight of added copper in the form of an oil soluble copper compound; and (e) a calcium or magnesium detergent. Claim 61 claims a "lubricating oil concentrate composition" comprising the same five ingredients in different, specified amounts.

The trial judge interpreted those claims for the jury, instructing them as follows:

I instruct you that Exxon's claims cover the ingredients which go into the composition. If you find that a Lubrizol product is made by using the starting ingredients in the amounts called for in one or more of Exxon's claims, then that product directly infringes.

Lubrizol argues that that instruction is wrong. It maintains that, regardless of what ingredients are mixed together, there is infringement only if the final lubricant composition contains the five claimed ingredients, in the claimed amounts. Thus, although it is essentially uncontested that Lubrizol adds ashless dispersant and the other claimed ingredients in the claimed amounts to its motor oil, Lubrizol argues that there is no infringement because it was not proved that "ashless" dispersant, in the claimed amount, was present in its *final* products. Specifically, it urges, the ashless dispersant that it uses in admixture with the other ingredients specified in the claims complexes with metal moieties from those ingredients so that the dispersant in the final product can no longer be considered "ashless."

Exxon, on the other hand, urges that the trial judge's instruction reflects the proper claim interpretation that ashless dispersant identifies a starting ingredient, and under that interpretation, it does not matter what complex forms between metal and the dispersant.

The majority opinion interprets the claims somewhere between the interpretations of Exxon and Lubrizol, as covering any mixed product—final or otherwise—in which the five ingredients specified in the claims exist in the claimed amounts. The majority accepts Lubrizol's proof that at least some ashless dispersant is converted to nonashless dispersant during production of Lubrizol's products, and because of that, proving that the required amounts of the five ingredients were mixed is not enough to prove infringement. Consequently, to show infringement, the majority believes that it was Exxon's burden to prove that, at some point during production of Lubrizol's products, the mixing

---

**3.** "Ashless" denotes an absence of combined or complexed metal. Lubrizol's Dr. Salomon testified that "it is easier from a manufacturing point of view to manufacture it in the ashless form." She added that "[a]s a formulator, I don't care [if it is ashless or non-ashless in the product] where I have some surprising discovery that affects performance. But it doesn't matter to me.... Typically, most dispersants are made ashless from a manufacturing point of view."

**4.** The polymeric viscosity index improver ("PVII") is not at issue here, inasmuch as the challenged Lubrizol products are alleged to use the ashless dispersant, not the PVII. Henceforth, this opinion will not mention PVII.

pot contained *the claimed amounts* of "ashless dispersant" and the other four claimed ingredients. And, the majority concludes, Exxon has not introduced enough evidence in the record to meet that burden.

I agree with the trial judge's interpretation of the claims that one skilled in the art, upon reviewing the patent specification, claims, prosecution history, and testimony, would interpret claims 1 and 61 as covering a lubricating oil composition comprising the product resulting from a combination of the required five ingredients, in the claimed amounts, regardless of any unknown reactions, or metal complexes formed between those ingredients that occurs upon mixing. With that interpretation, literal infringement is admitted.

## A. *Claim Interpretation In General*

To determine the meaning of claims, we must examine the patent specification, other claims, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir. 1995) (*in banc*). Resort to testimony of those knowledgeable in the art might also be helpful to the court inasmuch as claims are interpreted from the perspective of one of ordinary skill in the art. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir. 1988).

## B. *The Specification and Claims*

The patent specification discusses the invention in terms of an additive for motor oil which does not interfere with the function of other additives. The particular focus is on addition of the copper compound as an antioxidant and the amount of it that is employed. Moreover, the amounts specified in the working examples and other parts of the specification are identified as the amount of the additives, not the amounts in the final product after mixing. There is no analysis anywhere in the specification of the identity of intermediate or final "complexation" prod-

ucts produced by combining the ingredients specified in the claims, or of their amounts. In light of those omissions, to say that one of ordinary skill in the art would nevertheless conclude that the proportions must be measured in the pot is divorced from reality.

The interpretation that the claims list starting ingredients is bolstered by comparing the many nonborated, ashless dispersants disclosed at columns 6–8 of the patent, and expressly included in the claims, with the one type of dispersant—the borated version of certain ashless dispersants—that the parties agree does not complex with the metal moieties from the other ingredients specified in the claims. Because the nonborated, ashless dispersants do not remain completely ashless when mixed with the other ingredients specified in the claims, under the majority's interpretation the claims would not cover use of such dispersants if a sufficient amount thereof complexed with metal to form nonashless dispersants. Yet, it is those nonborated dispersants to which the specification and claims are primarily directed.[5] Consequently, the majority interpretation limits coverage to far fewer dispersants than indicated by the specification and claims.

Moreover, the '890 specification does not describe nor teach the invention contemplated by the majority's claim interpretation, *i.e.*, it does not teach the types of dispersant, amounts thereof, or the conditions needed to attain a composition containing—after complexation—the amounts of ingredients specified in the claims. Although, under the majority's interpretation, the specification would be enabling for the claimed borated dispersants (because they do not complex), those dispersants constitute only a small portion of the disclosed and claimed dispersants. Hence, formulating the composition as interpreted by the majority, even if within ordinary skill in the art, would require extensive experimentation not even suggested in the patent, thereby rendering the claims invalid.[6]

---

5. Borated ashless dispersants are discussed at column 8, lines 43–50 of the '890 specification and are used in the four working examples. Of the 83 claims in '890, claims 7, 14–24, 30, 37–60, 65, and 72–82 specifically mention the borated, as well as other, dispersants.

6. *See generally Genentech, Inc. v. The Wellcome Foundation Ltd.*, 29 F.3d 1555, 1564–65, 31 USPQ2d 1161, 1168 (Fed.Cir.1994) (rejecting a claim interpretation that covers many inoperative permutations); *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576–77,

## C. *Prosecution History*

As does the specification, the prosecution history focuses on the additives as starting ingredients, not on any reaction products (and the amounts in a final or intermediate product). As an example, the Examiner's Answer prepared with respect to appeal of the examiner's rejection of the claims in Application Ser. No. 362,114 (which was the grandparent of Application Ser. No. 49,712, the application resulting in the '890 patent), states:

> The claims are believed to be directed to the composition comprising known additives, combined at conventional levels of additions for their combined attendant functions.

And in the Reply Brief to that Examiner's Answer, the applicants state:

> The question should be whether the specific combination of additives claimed by Appellants is novel, and gives it unobvious results. The answer is the combination is novel and the combination does give unexpected results.

And elsewhere during prosecution of that application, and of SN 049,712, the examiner refers to "the various additives of the claims (dispersants ... dithiophosphates ...)."

Exxon's interpretation is also supported by the following episode. SN 362,114 included both claim 37, which referred to a "copper compound," and claim 38, which was to a "composition according to claim 37, said copper compound being oil soluble." Claim 38 was rejected because it duplicated claim 37.[7] The examiner took the position that the copper compound *must* be oil soluble—hence, "copper compound" and "oil soluble copper compound" are the same. The applicants,

however, argued that "[o]ne can have a solution of a *dispersant complexed* with an oil insoluble copper compound, or can have an oil soluble [copper] compound" (emphasis added). Similar debate transpired during prosecution of Application SN 177, 367, the parent of SN 362,114. The Board agreed with applicants.[8]

The argument made during prosecution that some of the claims read on embodiments wherein the copper complexes with the ashless dispersant is probative of Exxon's claim interpretation as well as that of the examiner. Specifically, it shows the claim is directed to a product with "ashless" dispersant as a starting ingredient, inasmuch as some of the claims covered formation of a complex between that dispersant and metal, a formation that would render the dispersant "nonashless". Significantly, the examiner found no flaw in claiming a motor oil product with additives as set out in Exxon's claim here (and I note in its foreign applications as well).

## D. *Other Considerations*

The record includes testimony by Exxon witnesses that it is not known how copper serves as an antioxidant in the environment of the claimed composition, that certain reactions are not predictable in that environment, even though they might be predictable in a model, that it is uncertain whether zinc or phosphorus of ZDDP undergoes interaction, and in general, that no one was certain of the exact identity of the final composition or what was happening in the pot. Despite that, the majority holds applicants responsible for knowing about the formation of a

---

224 USPQ 409, 414 (Fed.Cir.1984) ("if the number of inoperative combinations becomes significant, and in effect, forces one of ordinary skill in the art to experiment unduly in order to practice the claimed invention, the claims might indeed be invalid"); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir. 1983) ("Because it is for the invention as claimed that enablement must exist, and because the impossible cannot be enabled, a claim containing a limitation impossible to meet may be held invalid under § 112."), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984).

**7.** Paragraph 2 of 35 U.S.C. § 112 (1988), states: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

**8.** The Board noted that the examiner had not yet raised an "insufficient disclosure" rejection (under 35 U.S.C. § 112, ¶ 1). That rejection was subsequently raised, in the context of rejecting claims 15–17 of SN 049,712 on the specific ground of insufficient support in the specification for an oil insoluble copper compound. Those claims were eventually dropped by applicants.

complex between the five ingredients required by the claims. In effect, therefore, the majority opinion penalizes applicants for not knowing or caring about exactly how their invention works.

But, "it is axiomatic that an inventor need not comprehend the scientific principles on which the practical effectiveness of his invention rests." *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570, 219 USPQ 1137, 1140 (Fed.Cir.1983); *accord In re Isaacs*, 347 F.2d 887, 892, 146 USPQ 193, 197 (CCPA 1965). As stated in *Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 435–36, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911):

> And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative items involved. [Citations omitted.]

In that respect, Frank Johmann, who helped prosecute the relevant applications for Exxon, stated:

> [When looking at an invention like this with a number of components, to determine infringement] . . . you look at what is combined to make the product. The reason for that is that the patent law doesn't require that you understand what happens to that final product. All that is necessary is how you obtain the result. And it is sort of like baking a cake. You mix them together. And what happens chemically in the oven, you are not concerned with. With these compositions, what happens in the engine no one really knows and it is not a consideration.

Mr. Johmann stated that he has "seen probably literally thousands of lubricant patents over the years, and this is like a standard format for a composition." *Id.* Thus, claiming the composition in terms of amounts of additives is "a typical way it is done in connection with motor oil additives." *Id.* Though Mr. Johmann was a patent practitioner, as opposed to a scientist skilled in the art, he adds to the record the perspective of one who has seen many patents in this field, and by shedding some light on how claims have been written in the field, he helps illuminate how one skilled in the art would read the '890 claims.

Furthermore, when Lubrizol asked its own employee, Mr. Pindar, in 1988 to determine whether certain of its products infringed the European counterpart of '890, he performed the analysis by comparing the starting ingredients, not the final or intermediate products. Mr. Pindar, who was a scientific advisor to Lubrizol, read the claims as a person of skill in the art would read the claims. Moreover, Dr. Salomon, a lubricant formulator working for Lubrizol, testified (although not in the specific context of interpreting claim language) that her concern as a formulator is "what goes in the pot."

Lubrizol argues that Exxon's omission of the word "mixture" from the '890 claims precludes interpretation of the claims as a list of starting ingredients. This is indeed a slender reed on which to lean. "Mixture" is implied in the composition claims at issue, because by listing five "additives," the claim implies that coverage is for a mixture of those. Thus, Exxon is claiming a "composition of matter," which:

> "... is an instrument formed by the intermixture of two or more ingredients, and possessing properties which belong to none of these ingredients in their separate state.... The intermixture of ingredients in a composition of matter may be produced by mechanical or chemical operations, and its result may be a compound substance resolvable into its constituent elements by mechanical processes, or a new substance which can be destroyed only by chemical analysis." [Footnote omitted.]

Walker notes that "this class is a very broad one and embraces chemical compounds, mechanical or physical mixtures, alloys and a great variety of things." [Footnote omitted.]

1 Chisum, PATENTS, § 1.02[2] at 1–10 (1995) (quoting from W. Robinson, The Law

of Patents for Useful Inventions 278–79 (1890)).

### E. *Conclusion*

Lubrizol added to its motor oil the ingredients taught by the specification, and articulated in the claims, of Exxon's '890 patent. Lubrizol then sought to avoid infringement by arguing at trial that the claims are not literally infringed because metal ions from some of the ingredients complex with the ashless dispersant specified in the claims, converting "ashless dispersant" to nonashless dispersant. That argument was unsuccessful under the district court's claim interpretation, but it has succeeded on appeal under the majority's claim interpretation.

The majority and concurring opinions seem to be of the view that, if Exxon wanted to claim a lubricating oil composition formed by combining the five ingredients specified in the claims, it made a technical error in writing the claims. The majority would require a product by process claim to cover a product comprising a formula of starting ingredients even though the claim requires no particular method of mixing or particular process steps. It is not a "recipe" with specific directions for making the product. Certainly the examiner found nothing technically wrong with the claim as a list of additives for motor oil. In the view of an experienced claim drafter, Mr. Johmann, this is a standard form for such a product. I am of the view that, to one of ordinary skill in the art, the claims as written cover a product, not a method.[9] Consequently, I disagree with the majority and would affirm the district court's judgment of liability.

### II.

I would add that the majority's reversal is an extraordinary disposition assuming its interpretation were correct. This appeal challenges the district court's ruling on Lubrizol's renewed motion for JMOL under Fed. R.Civ.P. 50. The majority holds that the district court's ruling on the merits of Lubrizol's motion was correct. Lubrizol's argument for JMOL—that the claims define the final product—is rejected. If Lubrizol had attempted to advance the position of the majority in this appeal, we would have rejected the argument as outside the grounds asserted in the JMOL motions, before submission to the jury, as well as after the verdict was returned. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579, 1 USPQ2d 1081, 1091 (Fed.Cir.1986) ("A specific reference to an issue in a motion for JNOV cannot preserve that issue for appeal where that issue was not specifically included in a motion for directed verdict made before the jury retired to consider its verdict."); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1324, 21 USPQ2d 1161, 1164 (Fed. Cir.1991) (" 'Fed.R.Civ.P. 50(b) allows for entry of JNOV 'only in accordance with the party's motion for a directed verdict.' "), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992).[10] The issue on appeal is not the global question "What do Exxon's claims mean?" but rather "Did the district court err in denying Lubrizol's JMOL?" It is not unusual to see a case where a party failed to raise a defense on which it might have prevailed. However, our review of a trial court's ruling on a motion for JMOL is

9. The majority, in its footnote 3, questions whether the claims as so interpreted would be literally infringed if one of the "starting ingredients" is made in situ. That issue is not before us, but it appears to me that there would be literal infringement in such a circumstance because the product formed "in situ" itself can be considered a "starting ingredient".

10. The majority does not dispute the proposition of law quoted from *Orthokinetics* but relies on an alternative ground of decision that no objection was made to the grounds stated in the post-verdict motion. In *Malta*, this court held that a general post-trial JMOL motion incorporated the specifics of the earlier JMOL motion. The ma-

jority finds support in *Malta* because the broader meaning it gives the claim than that advanced by Lubrizol is smaller than the spread between the general and specific motions in *Malta*. I read *Malta* to say that the general and specific motion in that case were the same. In any event, the majority's premise that Exxon is not prejudiced by denial of a new trial is flawed because the majority advanced a broader claim interpretation than that advanced by Lubrizol. Infringement of a narrower claim would establish infringement of a broader claim to the same invention, but the converse is not true. Failure to prove infringement of the narrower claim does not establish non-infringement of the broader claim.

limited to the grounds asserted.[11] The authority of an appellate court to enter a judgment rather than remand is severely circumscribed. If no motion for JMOL on the issue is made an "appellate court [is] without power to direct the District Court to enter judgment contrary to the one it had permitted to stand." *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 218, 67 S.Ct. 752, 756, 91 L.Ed. 849 (1947); *see also Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 854, 20 USPQ2d 1252, 1255 (Fed.Cir.1991) ("Quite clearly, the only available remedy upon finding error in a judgment entered on a jury verdict where [issue not preserved by proper JMOL] is limited to a remand for a new trial."), *cert. denied,* 504 U.S. 980, 112 S.Ct. 2957, 119 L.Ed.2d 579 (1992).

The precedent cited by the majority for reversal is inapt. In *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 19 USPQ2d 1367 (Fed.Cir.1991), this court agreed with the appellant's position raised below by JMOL and on appeal. No material issue of fact prevented entry of judgment on appeal. In *Jamesbury Corp. v. Litton Indus. Prods.,* 756 F.2d 1556, 225 USPQ 253 (Fed.Cir.1985), the JMOL was reversed on the argued grounds and the case was remanded for trial of other issues. *Dana Corp. v. IPC LTd. Partnership,* 860 F.2d 415, 8 USPQ2d 1692 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989), reversed a JMOL on the ground argued below and on appeal.

The wisdom of Rule 50 cannot be gainsaid. By advocating a different interpretation of the claim *sua sponte,* the majority required Exxon to litigate during trial not only its opponent's position but also the unknowable position of the appellate court. Exxon has been deprived of a jury trial on an unasserted and *untried* theory. The majority decision comes out of the blue. The majority opines that the requirement that Exxon prove infringement of a *product* claim does not come out of the blue, and that Exxon,

therefore, is not entitled to escape the flaw of its claim drafting by a second trial. This reflects the majority's view, not Exxon's, that a list of additives for motor oil is an invention for a process or for a product made by a process. Exxon never asserted that its claim was for anything but a product. Without pointing to any rule set by the statute or a regulation or by the MANUAL OF PATENT EXAMINING PROCEDURE, the majority decides that Exxon's standard type of claim is poorly drafted.

The majority then states that Exxon attempted to prove infringement under the majority's claim interpretation by evidence of what happened chemically in the pot in pre-final states. This evidence "is credited" in determining the post-trial motion. The record discloses that Lubrizol attempted to prove that its *final* product did not contain ashless dispersant because of what happened in the pot. Lubrizol's theory was that its dispersant, although ashless to begin with, complexed with metal so as to become non-ashless in the *final* product. Exxon countered with evidence that such complexation was transient. To rule for Lubrizol, the majority must assume that the absence of proof by Exxon, for example, that for a few moments after mixing no complexation occurred—which would satisfy the majority's claim interpretation—means that that fact could not be proved. Whether or not Exxon was precluded from such proof is debatable. That issue was not part of Exxon's or Lubrizol's theory of the case. But precluded or not, there was no reason for Exxon to evaluate any intermediate product.

The majority notes its claim interpretation is broader than that of Lubrizol and, therefore, it is easier to prove infringement, but Exxon is denied that opportunity. In my view this is untenable. I read nothing in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995) which sanctions this procedure. *Markman*

---

11. Fed.R.Civ.P. 50: Notes of Advisory Committee on Rules (1991 Amendment) state:

The second sentence of paragraph (a)(2) does impose a requirement that the moving party articulate the basis on which a judgment as a matter of law might be rendered. The articulation is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof.

upheld a ruling on a JMOL motion. Exxon cannot conceivably have waived the issue of infringement under the majority's broader claim construction, as the majority rules. Exxon proposed deletion of an instruction on infringement by equivalents in the final version of the instructions, but this revision occurred only after the district court adopted Exxon's claim interpretation in its instructions. Exxon did not waive this issue in connection with Lubrizol's or the majority's different interpretation of the claim. The most the majority could say, as a matter of law, is that there is no possibility of proof of literal infringement. However, the question of infringement under the doctrine of equivalents is a jury question under the recent decision of this court in banc. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1520–21 (*per curiam*) (Fed.Cir.1995). The majority simply cuts Exxon off from its right to have the issue of infringement under the majority's claim interpretation tried to a jury.

For the foregoing reasons, I dissent to the merits and to the procedure adopted by the majority.

