**EXXON CHEMICAL PATENTS, INC., Exxon Corporation and Exxon Research and Engineering Co., Plaintiffs–Appellees,**

v.

**LUBRIZOL CORPORATION, Defendant–Appellant.**

Nos. 93–1275, 94–1309.

United States Court of Appeals, Federal Circuit.

Feb. 23, 1996.

■

Donald R. Dunner, and Allan M. Sokal, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, D.C., Charles Alan Wright, of Austin, Texas and E. Edward Bruce, Covington & Burling, of Washington, D.C., for plaintiffs-appellees, filed a Petition for Rehearing and Suggestion for Rehearing In Banc.

S. Leslie Misrock, Pennie & Edmonds, of New York City, Timothy B. Dyk, Jones, Day, Reavis & Pogue, of Washington, D.C., George J. Moscarino, and John W. Edwards, II, Jones, Day, Reavis & Pogue, of Cleveland, Ohio, Stanton T. Lawrence, III, Pennie & Edmonds, of Washington, D.C., and Kenneth R. Adamo, Jones, Day, Reavis & Pogue, of Dallas, Texas, for defendant-appellant filed a Response to appellees' Petition for Rehearing and Suggestion for Rehearing In Banc.

■

## ORDER

A combined petition for rehearing and suggestion for rehearing in banc having been filed by the appellee, and a response thereto having been invited by the court and filed by the appellant, and the petition for rehearing having been referred to and acted upon by

the panel that heard the appeal, and, thereafter, the suggestion for rehearing in banc, the response and a reply to the response, having been referred to the judges authorized · to request a poll whether to rehear the appeal in banc, and a poll having been requested, taken, and failed, it is

ORDERED that the petition for rehearing be, and the same hereby is DENIED; and it is further

ORDERED that the suggestion for rehearing in banc be, and the same hereby is, DECLINED.

Circuit Judge Mayer concurs in a separate opinion.

Circuit Judge Clevenger, with whom Circuit Judge Plager joins, concurs in a separate opinion.

Circuit Judge Newman dissents in a separate opinion.

Chief Judge Archer, Circuit Judge Rich, and Circuit Judge Schall did not participate in the poll.

MAYER, Circuit Judge, concurring.

This is another example of the predicted mischief of *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.), *cert. granted,* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). Two judges have divined an interpretation of the claim that occurred to no one else in this extensive litigation. None of the parties or the trial court offered the interpretation that these two judges chose, and none of the extensive extrinsic evidence about how those skilled in the art would understand the claim supports it. After *Markman,* apparently the meaning of a claim has very little to do with the parties' theories of the case and the record made in support, and everything to do with what at least two judges here prefer regardless of the record.

CLEVENGER, Circuit Judge, with whom PLAGER, Circuit Judge, joins, concurring in the court's denial of the petition for rehearing in banc.

Because more than twelve thousand pages will separate the decision of the court in this case, found at 64 F.3d 1553 (Fed.Cir.1995), from the comments of Judges Newman and Mayer, we shall quickly bridge the gap to ease the mind of any concerned reader.

Judge Newman's general views on how to read the claims in suit reduce themselves to a simple proposition. Although Exxon's patent is on a specifically defined chemical product (a "lubricating oil composition suitable as a crankcase lubricant"), Judge Newman treats Exxon's claims differently, as if they were drawn to a formula (or recipe) for making whatever product results from mixing the ingredients named in the formula. Were such the case, Exxon would have won on its proofs in this case. Instead, Exxon sued Lubrizol on a chemical product claim. To win, Exxon had to prove that Lubrizol's product contains, in the specific amounts stated in the patent, the chemicals named in Exxon's patented formula. Although Exxon proved that Lubrizol's product contained the named chemicals, it failed to prove that those chemicals are present in Lubrizol's product in the specific required amounts. So Exxon lost.

The basic claim interpretation theory adopted by the court was put forth by Lubrizol in its defense to Exxon's suit, as explained in the court's opinion, .which amply demonstrates the respects in which our colleagues have misread the opinion and the record in this case.

PAULINE NEWMAN, Circuit Judge, dissenting from the denial of rehearing in banc.

The court's decision in the case of *Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 35 USPQ2d 1801 (Fed.Cir.1995), creates important new law governing the claiming of chemical compositions. Adopted by split panel decision, it is gravely incorrect. It is incorrect as a matter of law, as a matter of chemistry, and as a matter of patent practice. The panel majority's new rule of "claim construction" will cast a cloud upon many thousands of existing patents, and major classes of chemical invention will confront unclear, unnecessary, confusing, expensive, and perhaps impossible scientific requirements.

The panel majority holds that a claim to a chemical formulation composition can not be infringed if there is interaction between any of the ingredients after they are added to the composition, such that any ingredient changes in chemical form or ratio from that listed in the claim. Thus any chemical change or interaction within the composition, even loose "complexing" as appears to happen between ingredients of this composition, renders the claim useless. The panel majority holds that it does not matter that the Lubrizol composition is identical to the claimed composition: the purported changes inside the composition after it is made is held by the panel majority to negate infringement.

This is a new and incorrect rule of claim construction. It is not necessary to state the myriad interactive changes that occur in chemical solutions or dispersions, in order to describe this lubricant formulation clearly and unambiguously. Many thousands of chemical patents are written in the simple combination style here found fatally wanting. Consider Exxon's claim 1 shown in the margin,[1] a straightforward list of the ingredients of the composition, all of which are known lubricating oil additives except the copper component, which is listed at "D" in the claim.

Most or all chemicals interact to some extent in solution, wherein ions and molecules rearrange based on forces of various kinds. Under the court's new law, table salt dissolved in water will not be an adequate description of the composition for infringement purposes, since the sodium chloride molecule no longer "exists": in dissolution the sodium and chloride ions will have broken their bonds to each other, in interaction with molecules of water. For the Exxon lubricant composition the interactions in the pot were exceedingly complex. However, like salt in water, there is no uncertainty as to what was made and what was infringed. When the invention is adequately described and claimed by listing the ingredients of the composition, and is understood by persons of skill in the field of the invention, the law demands no more. To require inventors to identify and include in their claims the chem-

---

1. 1. A lubricating oil composition suitable as a crankcase lubricant in internal combustion engines comprising:

A. a major amount of lubricating oil;

B. a dispersing amount of lubricating oil dispersant selected from the group consisting of:
(1) ashless nitrogen or ester containing dispersant compounds selected from the group consisting of:
(a) oil soluble salts, amides, imides, oxazolines, esters, and mixtures thereof, of long chain hydrocarbon substituted mono- and discarboxylic acids or their anhydrides;
(b) long chain aliphatic hydrocarbons having a polyamine attached directly thereto; and
(c) Mannich condensation products formed by condensing about a molar proportion of long chain hydrocarbon substituted phenol with from about 1 to 2.5 moles of formaldehyde and from about 0.5 to 2 moles of polyalkylene polyamine; wherein said long chain hydrocarbon group is a polymer of a $C_2$ to $C_5$ monoolefin, said polymer having a molecular weight of from about 700 to about 5000;
(2) nitrogen or ester containing polymeric viscosity index improver dispersants which are selected from the group consisting of:
(a) polymers comprised of $C_4$ to $C_{24}$ unsaturated esters of vinyl alcohol or of $C_3$ to $C_{10}$ unsaturated mono- or discarboxylic acid with unsaturated nitrogen containing monomers having 4 to 20 carbons,

(b) copolymers of $C_2$ to $C_{20}$ olefin with $C_3$ to $C_{10}$ mono- or discarboxylic acid neutralized with amine, hydroxy amine or alcohols, and
(c) polymers of ethylene with a $C_3$ to $C_{20}$ olefin further reacted either by grafting $C_4$ to $C_{20}$ unsaturated nitrogen containing monomers thereon or by grafting an unsaturated acid onto the polymer backbone and then reacting said carboxylic acid groups with amine, hydroxy amine or alcohol; and
(3) mixtures of (1) and (2); wherein when said lubricating oil dispersant (1) is present, then said dispersing amount of (1) is about 1 to 10 wt. %, and when said lubricating oil dispersant (2) is present, then said dispersing amount of (2) is from about 0.3 to 10 wt. %;
C. from about 0.01 to 5.0 parts by weight of oil soluble zinc dihydrocarbyl dithiophosphate wherein the hydrocarbyl groups contain from 1 to 18 carbon atoms;
D. an antioxidant effective amount, within the range of from about 5 to about 500 parts per million by weight, of added copper in the form of an oil soluble copper compound; and
E. a lubricating oil detergent additive which comprises at least one magnesium or calcium salt of a material selected from the group consisting of sulfonic acids, alkyl phenols, sulfurized alkyl phenols, alkyl salicylates and naphthenates, wherein said parts by weight are based upon 100 parts by weight of said lubricating composition and said weight % is based on the weight of said lubricating composition.

ical interaction products formed in such a complex mixture is not necessary in order distinctly to state what the inventor regards as his invention. 35 U.S.C. § 112 ¶ 2:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

The court's holding that a chemical composition claim that is written by listing the ingredients can not be enforced against the identical composition made by combining the identical ingredients in the identical ratio, unless none of the ingredients interact when they are placed together, is simply bad law. It is without precedent, and it is contrary to the way that chemical formulation composition claims are understood within the chemical and the legal communities. This *sua sponte* transformation of the patent law does not bode well for this court's implementation of its *Markman* role as *de novo* construer of patent claims.

Despite the serious disruption of chemical patent-dependent activity flowing from this decision and the massive taint upon existing property rights, the court has declined *en banc* review. Thus I write to explain why I believe that the panel majority has made an error of major consequence, an error that transcends the interests of these parties and this patent.

### Chemical Formulation Compositions Are Correctly Claimed by Their Ingredients

The standard way of claiming chemical compositions is by their ingredients. Naming the chemicals and their amounts is the clearest, most accurate, and most comprehensible way of describing such inventions. Often there is no other way of describing chemical compositions. In Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* (3d ed. 1990) the author explains the pervasiveness of this type of claim in chemical inventions:

> As in the other classes, *most composition claims are combination claims* except

where a new compound or molecule per se is claimed.

\* \* \* \* \* \*

> Composition of matter claims *list the chemical ingredients (compounds, elements, or radicals) making up the composition* or compound. The ingredients or elements may be claimed narrowly (specific named components), with intermediate scope (a group of similar elements functionally equivalent), or broadly as to function performed, where the prior art permits. *Where necessary to novelty, etc.,* the proportions or other conditions or parameters of the compound are stated, usually in ranges of concentration of ingredients.

*Id.* at 145, 148 (emphases added). Chemical compositions that are mixtures of ingredients are routinely claimed by listing the ingredients. Such a composition is easy to describe with precision, easy to search and to examine for patentability, easy to understand, and unambiguous in content and scope. Whether there is interaction among the ingredients after they are placed in the container does not affect the specificity of the description of what has been invented. It is not necessary to know what physical or chemical interactions occur in the container in order to describe this invention, which resides in the combination of listed ingredients.

The law requires that the claims "reasonably apprise those skilled in the art both of the utilization and scope of the invention," and that "the language is as precise as the subject matter permits." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 624, 225 USPQ 634, 641 (Fed.Cir.1985). That requirement was plainly met by the claims in suit, for they were written as lubricant formulators would write them and understand them, by listing the ingredients of the composition. Whatever the scientific nature of the chemical interactions inside the container, the established and probably only way of describing such formulations is by their ingredients. The court creates a scientific burden that is totally unnecessary and perhaps impossible[2] to meet. There was

---

2. Exxon's expert witness, Dr. Ingold, testified as to the scientific possibility of proving what the

panel requires:

extensive evidence at trial, presented by witnesses on behalf of both Exxon and Lubrizol, concerning what happens when these ingredients are put in the same container. Noted scientists debated the issue. The trial judge recognized that it was not possible to know what was happening inside the pot.

The court's holding that such claims are not infringed if changes occur within the composition after the ingredients are combined, simply means that such compositions can no longer be patented in this way. The court's requirement that the patentee must state in the claim the products of chemical interaction that occur in the mixing pot, simply means that failure to do so leaves a useless patent that can not be enforced against the identical composition made from the identical ingredients in the identical ratios.

The court's ruling will impose disorder and uncertainty upon many fields of applied chemistry, for this claim form is the standard way of claiming new formulation inventions. The treatises teach the routine nature of such claims, recognizing that the components of a chemical composition are not a "mere aggregation," but cooperate in "joint action":

> A composition or product is patentable when it involves (1) a new and useful result and this result is a product of the combination and *not the mere aggregation* of several results; (2) a different result in *the combined forces* or processes from that given by their separate parts and a new result is produced by their union; (3) a result which is not the mere aggregate of separate contributions but is due to the *joint and cooperating action* of all the elements; and (4) several elements which produce by their *joint action* a new and useful result.

3 Anthony W. Deller, *Patent Claims* (2d ed. 1971) § 465 at 48 (citing *Colgate–Palmolive Co. v. Carter Products, Inc.*, 230 F.2d 855 (4th Cir.1956)) (emphases added). Deller's

and other treatises provide many examples of such compositions, all claimed by listing their ingredients.

I conducted a rough survey in the Official Gazette of the Patent and Trademark Office for December 26, 1995, which announced the issuance during the preceding week of 608 patents classified as "chemical." About a hundred of these patents were for chemical compositions that were claimed by listing their ingredients. For example, there were patents on a pollution control composition, a dye transfer inhibiting composition, a shampoo composition, a paint stripper composition, a polyol composition for polyurethane foams, a cold water detergent composition, a granular detergent composition, a wood preservative, an adhesive composition, photosensitive and radiation-sensitive resin compositions, an x-ray film developer composition, a radiation-absorbing glass composition, and many more. All were claimed by listing the ingredients.

The invention of all such compositions is well described by the ingredients that are combined. Whatever interactions occur within the container holding the composition is irrelevant to the specificity and clarity of the claim and its understanding by persons in the field of the invention. The patent statute requires that the subject matter be described so that persons in the field know what has been invented. 35 U.S.C. § 112 ¶ 1:

> The specification shall contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Q Do you know of any other technique which would allow a chemist to determine precisely what is going on with respect to these hand-holding type interactions [the witness' description of the loose bonds the parties referred to as complexing] in a modern motor oil package?

A Dr. Barrett, there is no such technique available today, nor is there any combination of techniques available today that would let one say what was present after you have mixed all four of those components.

It is basic chemistry that most organic and inorganic molecules when placed in solution interact in various ways. Such interactions may produce improved properties, thus providing the commercial value that inventors seek to secure through the patent system. Indeed, as stated by Deller in *Patent Claims, supra*, the patent office will not grant a patent on compositions where the properties are simply an aggregation of the known properties of the separate ingredients.

It was interesting to learn that the distinguished chemists who testified for both sides did not know with scientific certainty the interactions occurring in this complex lubricant formulation. The following exchange occurred during argument to the trial judge concerning "claim construction":

Exxon counsel: ... We have Dr. Ingold's testimony about them [the chemical ingredients] coming together and breaking apart. We have Dr. Schroeck admitting that was true. But under cross, he admitted yes, they break apart. These phantom compounds that nobody can find.

> \*     \*     \*     \*     \*     \*

LeSuer, although Mr. Adelman didn't remember it, says I don't know exactly what this is but it is definitely a stable linkage.... That is totally different from Dr. Schroeck saying that they are breaking apart all the time and Dr. Cotton saying these compounds are going back and forth, they are complexing and uncomplexing.

> \*     \*     \*     \*     \*     \*

District Court: ... I wanted to know if there is any way to find out what is in that composition, and you can't. Only a fool would try.

A lubricant composition described and claimed by listing the ingredients is appropriate to an invention that is indeed a combination of ingredients. A patent attorney testified that he has seen "literally thousands of lubricant patents" described and claimed, as in the Exxon patent in suit, by listing the ingredients. The panel majority's new requirement is contrary to chemical and practical reality, as is its speculation that Exxon could not prove infringement even under the court's new theory: the reason given for denying Exxon the chance to do so. Chemists know that all chemical reactions have a reaction time and a reaction threshold. Chemists understand the concepts of chemical reactivity and measurement of activity coefficients. Studies of chemical equilibria and thermodynamic principles as applied to chemical reactions, the basics of ionic forces in solution, and principles such as the Law of Mass Action (relating chemical equilibrium and concentration), are elementary tools of classical chemistry. Chemists know that when chemicals are placed in solution or dispersion they interact with the solvent or dispersant; they may form new bonds, or respond to attractive or repulsive forces, or form loose or tight complexes, or be subject to a variety of other interactions, often a combination of interactions in dynamic equilibrium, in a constantly fluctuating swirl of chemical complexity. Dr. Ingold explained these interactions at the trial:

> And the thing to try and remember about this is these weak [interactions] can break apart quite easily. So that this association between the dispersants and some molecule X can simply come apart and give you the detergent again plus the molecule X in free solution. And X can, of course, recombine. And this can happen thousands of millions of times. You don't in any way destroy the molecule in the dispersant nor do you affect X.

He further explained these interactions as they occur among the constituents of the additive packages:

> Q .Dr. Ingold, do all of these components interact in the same associated way that we have discussed for the ZDDP and the ashless dispersant? Do they all interact that way?
>
> A Yes, Dr. Barrett, they interact with one another. They also interact with themselves. Everything is interacting with everything else. It is associating. They are associating and breaking up. It is a grand mixture as the molecules come together and associate and then fall apart again and—or take a new partner and reassociate.

Dr. Cotton, Lubrizol's chemistry expert, analogized these kinds of bonds to a square

dance, where molecules release one partner and reattach to another and continue releasing and reattaching in a condition of equilibrium.

When the invention is the combination of ingredients, the occurrence of interactions in the pot does not defeat the adequacy of the description of the invention to persons in the art. The patenting of formulation compositions by identifying the components of the composition is legally sound, simple, and serviceable, and permits infringement or noninfringement to be readily determined, for it is necessary only to ascertain whether the listed ingredients are combined in the listed ratios.

### The Patent Grant Encompasses Making, Using, or Selling the Patented Invention

The patent act states that "whoever without authority makes, uses, offers to sell or sells any patented invention," 35 U.S.C. § 271(a), infringes the patent. That statutory requirement is satisfied when the "recipe" of the claims is followed. Thus the panel majority has erred in applying the law, for the patented composition is made when the ingredients are combined.

The Exxon specification states that "modern lubricants are complex mixtures of various additives each serving a particular purpose." Col. 1 line 67 to col. 2 line 5. The specification describes the purpose of the various additives that are listed in the claim. It was testified at trial that the concern of lubricant formulators is "what goes into the pot," in the words at trial of Lubrizol's formulation chemist Dr. Salomon. An inventor need not understand the scientific mechanism in order to place an invention into the patent system. *See Newman v. Quigg,* 877 F.2d 1575, 1581, 11 USPQ2d 1340, 1345 (Fed. Cir.1989) (observing that "it is not a requirement of patentability that an inventor correctly set forth, or even know, how or why the invention works"); *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1570, 219

USPQ 1137, 1140 (Fed.Cir.1983) ("[I]t is axiomatic that an inventor need not comprehend the scientific principles on which the practical effectiveness of his invention rests."). The suggestion by the panel majority that Exxon's patent attorney did not know how to write claims is misdirected. These claims are written in the clearest, simplest, and most accurate way in which a formulation can be described: by listing the ingredients. I can discern no justification for the court's departure from this long-standing and reasonable claim practice.[3]

Indeed, the panel majority's concurring opinion suggests that if Exxon's ingredients remain sufficiently uncomplexed or unreacted for a period of time after mixing (an hour? a minute? a nanosecond?) the claim would be infringed even on the majority's interpretation. However, the majority denied Exxon the opportunity to prove such fact.

### Justice Requires Remand When this Court Creates a New Law of Claim Construction

Having adopted a claim construction that neither party proposed and that is without legal precedent, the panel majority nonetheless declined the patentee's request for remand so that the patentee could present factual evidence or argument relevant to this new "law" as applied to this case.

Fair procedure has been compromised by the court's refusal to remand to the trial court for the presentation of evidence or argument on the new factual issues raised by this court's new law of claim construction. *See Weade v. Dichmann, Wright & Pugh Inc.,* 337 U.S. 801, 808–09, 69 S.Ct. 1326, 1330, 93 L.Ed. 1704 (1949) (remand required to consider alternative theory of liability).

It is inappropriate for the appellate court to make its own scientific finding that such proof is not possible on the court's new criterion. Although the district court stated during discussion of the jury charge that what is in the composition can not be determined, *see*

---

**3.** The panel majority recognized that compliance with its new "law" of claim construction may not be scientifically feasible, and suggested that claim-writing gimmickry should have been invoked. Thus the panel majority proposes that a patentee might overcome the court's newly created obstacles with a "product-by-process" claim—

although this invention is neither a process nor a product, but a mixture of ingredients to form a composition. I will not speculate on whether the court's ruling can be made less pernicious by creative claim-writing, or how the patent examining process will implement this new law governing composition claims.

*supra,* apparently there was no discussion concerning whether there was a transient existence in the mixture of the uncombined ingredients, for that was not an issue. The district court did not discuss whether the "complexing and uncomplexing" described by Dr. Cotton, and the other interactions postulated by other witnesses, might permit the patentee to prove that the ingredients have at least a transient existence in the ratios stated in the claim. The rate of association or complexing is not discussed in the portion of the record provided us, and does not appear to have been at issue.

As a matter of procedural justice, a litigant is entitled to present its case when the court changes the law. *See Neely v. Martin K. Eby Constr. Co.,* 386 U.S. 317, 325, 87 S.Ct. 1072, 1078, 18 L.Ed.2d 75 (1968) (appellate court "may not order judgment where … the record reveals a new trial issue which has not been resolved"); *Brinley v. Commissioner of Internal Revenue,* 782 F.2d 1326, 1336 (5th Cir.1986) (justice requires the opportunity to present evidence in light of new legal rule established on appeal). Although the appellate court need not remand for a futile trial, *Boyle v. United Technologies Corp.,* 487 U.S. 500, 513–514, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988), it is apparent from the record that such a condition does not here exist. Thus, on the claim construction of the panel majority,[4] the patentee is entitled to develop the facts for application of our new law. Even as this court declined to correct *en banc* the panel's claim construction, the case should have been remanded for application of this new rule of law to the evidence. Thus, respectfully, I dissent from the court's denial of rehearing *en banc.*

---

**4.** I can not reconcile the Response's suggestion of today that the theory it adopted was presented at the trial, with the statement in the majority opinion "that Exxon's preferred claim interpretation is incorrect, and that Lubrizol's is only partly correct." 64 F.3d at 1555, 35 USPQ2d at 1802.